VIRGINIA R. SWIERCZEK, APPELLANT, V. BENJAMIN L. LYNCH ET
AL., APPELLEES.
466 N.W.2d 512

Filed March 8, 1991. No. 88-1073.

James R. Welsh, of Welsh & Sibbernsen, and Owen A. Giles for appellant.

Albert M. Engles and Gretchen K. Harvey, of Hansen, Engles & Locher, P.C., for appellee Lynch.

Patrick B. Donahue, of Cassem, Tierney, Adams, Gotch & Douglas, for appellees Caldwell and Archbishop Bergan Mercy Hospital.

HASTINGS, C.J., WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ., and COLWELL, D.J., Retired.

WHITE, J.

This medical malpractice action comes to us as an appeal from the district court's order sustaining the motions for summary judgment of three of the defendants. Virginia R. Swierczek, the plaintiff-appellant, brought the action based on alleged nerve injuries she suffered as a result of dental surgery. Named as defendants were an oral surgeon, a physician, an anesthesiologist, a nurse anesthetist, and a hospital. After several amended petitions and motions for summary judgment, the only remaining defendant is the anesthesiologist.

We reverse and remand to the district court for further proceedings.

The exhibits introduced in support of the motions for summary judgment establish that Swierczek, a 52-year-old fourth grade teacher in Omaha, was referred to Dr. Benjamin L. Lynch, an oral surgeon, on January 4, 1982, for treatment of

periodontal disease. Dr. Lynch advised Swierczek to have all of her teeth removed and recommended that she obtain a second opinion from Dr. Leo Ambrose. On or about March 21, Swierczek saw Dr. Ambrose and had impressions made for dentures. Because Swierczek had a history of bleeding during dental treatments, the surgery was scheduled for Archbishop Bergan Mercy Hospital.

The afternoon of June 7, Swierczek was given a complete preoperative physical examination by Dr. John D. Hartigan, a physician who is no longer a party to this case. No other physical problems were found, and Swierczek was admitted to the hospital. On admission, a nurse completed an assessment form based on information provided by Swierczek. A discrepancy appears on the assessment form, where the space for the notation of neurological problems is checked "no [difficulty]" and "paresthesia," with "3 fingers [right] hand" indicated on the comment line. It is unclear whether both items were checked initially, or if one was added at a later time. (Paresthesia is defined as an abnormal sensation, such as prickling or tingling.)

The next day Swierczek was taken to the hall outside the operating room at approximately 11:25 a.m., where an "IV was placed in her right arm or hand." She was taken into the operating room and was asked to move from the transporting cart to a table. She said she remembered seeing Dr. Lynch and an assistant in the room and remembered being told that she would feel woozy. She then lost consciousness and does not remember anything further until about 7:30 a.m. on June 10.

Her sister-in-law, Irene Swircek, said that Swierczek awoke at about 4:30 p.m. on June 8 and said, "My God, I can't feel my hands." Swircek said she took one of Swierczek's hands to try to warm it, and Virginia cried out in pain. A nurse told them the pain would work out.

Swierczek noticed when she awoke on June 10 that she had abnormal sensation in both her little fingers and parts of her palms, similar to electric shocks. Swierczek complained about the sensation to a nurse, who told her it would go away. She also reported the feeling to Dr. Lynch, who apparently took no action. When Swierczek was released from the hospital on June

11, she continued to feel a tingling sensation in her hands and palms. The next day she visited Dr. Ambrose and told him about the pain in her hands. She stated that he said, "You have developed ulnar neuropathy."

Swierczek continued to complain about the pain in her hands when she visited Dr. Lynch on Wednesday, June 16. She also visited one of Dr. Hartigan's associates and reported the hand pain to him. Because her hands continued to bother her, she called Dr. Lynch again, on June 27, to ask what to do about the pain, and was told that he would try to reach a doctor for her the next day. At this time Swierczek could not touch her right shoulder, received shocks when she raised her arms, could not comb her hair, and could not hold objects.

Swierczek was seen on July 1 by Dr. Harold Ladwig, a neurologist, who noted in his report that "[t]he patient's examination reveals the presence of an ulnar neuropathy involving both ulnar nerves with greater involvement of the right upper extremity. The patient has continued to have severe dysesthesias involving the ulnar distribution bilaterally." (Dysesthesia is defined as the impairment of the sensitivity to touch.) Hospitalization was recommended for further diagnostic studies and treatment. She was readmitted to Archbishop Bergan Mercy Hospital on July 5. Dr. Ladwig consulted with Dr. D.L. McKinney, who also noted "[p]ossible bilateral ulnar neuropathy with pronounced dysesthesia." Swierczek remained in the hospital until July 17, receiving paraffin wax treatments and using an electrical stimulator for pain relief.

On July 22, Dr. Ladwig requested an evaluation for Swierczek at the Mayo Clinic. She was a patient there in August. Dr. Robert Dinapoli, a neurologist at the Mayo Clinic, concluded that Swierczek "developed a bilateral ulnar neuropathy, right more than left. This was due to physical compression of the nerves probably from local pressure with some subsequent damage to the nerve fibers." Dr. Dinapoli said it was expected that Swierczek would gradually recover with physical therapy and that surgery was not necessary.

Swierczek visited Dr. Lynch again, on August 20, for the removal of a root tip, or tooth fragment, which had broken off

during surgery. Dr. Lynch stated that this procedure and a postoperative x ray taken on August 25 ended his involvement with the plaintiff.

In a deposition, Dr. Hartigan explained ulnar neuropathy as a condition which involves poor function of the ulnar nerve, one of the three main nerves in the hand, which supplies innervation to the muscles which pull the fingers together. Dr. Hartigan stated that he has seen ulnar neuropathy occur following surgery as a result of pressure on the nerve, pressure which could come from the padding during surgery, the operating table, the transporting cart, a hospital bed, or a bed railing, "almost anything that could apply sustained pressure, usually unperceived by the person." A patient may not perceive the pressure because of the anesthetic. The ulnar nerve would be at greater risk in surgical procedures which are completed with the patient lying on her back, he said. However, Dr. Hartigan said he had no opinion as to the cause of Swierczek's ulnar neuropathy.

Because of the pain, Swierczek was able to return to teaching for only 1 week between June 1982 and January 1983. In a deposition taken March 26, 1986, Swierczek stated that she had not had the tingling sensation for about a year, but still has severe cramps in her hands at times and has to stop momentarily to wait until her fingers return to position. She said that her little finger will not bend and that she sometimes has a sensation of bugs crawling on her hands. For almost 30 years prior to the surgery she was a pianist and organist and is no longer able to play as she did earlier. Her sister-in-law stated that she has not heard Swierczek play the piano, organ, or accordion since the surgery and that Swierczek's hands have taken on a clawlike appearance.

## PROCEDURAL BACKGROUND

The plaintiff's initial petition, filed June 7, 1984, named as defendants Dr. Lynch; Dr. Hartigan; Dr. Edward E. Gatz, an anesthesiologist; C. Scott Caldwell, a nurse anesthetist; and Archbishop Bergan Mercy Hospital. Following an amended petition and motions for summary judgment by all defendants, the plaintiff moved for leave to file a second amended petition,

basing her claim on two theories of recovery—negligence and res ipsa loquitur. The district court granted the summary judgment motions of Drs. Lynch, Hartigan, and Gatz, and granted the summary judgment motions of Caldwell and Bergan Mercy on the negligence theory, but allowed the res ipsa loquitur claim against these two parties to stand.

The plaintiff then filed a motion for new trial seeking reversal of the dismissals of Drs. Lynch, Hartigan, and Gatz. The motion was overruled as to Dr. Hartigan and he was dismissed from the case. His dismissal has not been appealed to this court. Bergan Mercy and Caldwell filed a motion for new trial which was overruled. The portion of the earlier order which dismissed the plaintiff's petition as to Drs. Lynch and Gatz was vacated and set aside, and the res ipsa loquitur theory of recovery was reinstated.

Following third and fourth amended petitions, the defendants again moved for summary judgment. The motions of Dr. Lynch, Bergan Mercy, and Caldwell were sustained, and the motion of Dr. Gatz was overruled. The plaintiff's motion for new trial as to Dr. Lynch, Caldwell, and Bergan Mercy was overruled. The only remaining defendant is Dr. Gatz, the anesthesiologist. The plaintiff-appellant assigns as error the district court's order sustaining the motions for summary judgment of Dr. Lynch, Caldwell, and Bergan Mercy and dismissing the action as to them, which deprived her of the right to effectively proceed against Dr. Gatz, and the district court's failure to grant a new trial and to set aside the dismissal of Dr. Lynch, Caldwell, and Bergan Mercy.

## STANDARD OF REVIEW

In appellate review of a summary judgment, we view the evidence in a light most favorable to the party against whom the judgment is granted, in this case the plaintiff, and give her the benefit of all reasonable inferences deducible from the evidence. *Landon v. Pettijohn*, 231 Neb. 837, 438 N.W.2d 757 (1989). Summary judgment is properly granted only when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn

from those facts and that the moving party is entitled to judgment as a matter of law. *Id.*

We find that there are genuine issues of material fact as to the cause of Swierczek's injury and as to the responsibility for that injury. Summary judgment was not properly granted in this case, and we reverse the judgment and remand the cause to the district court for further proceedings.

## RES IPSA LOQUITUR

The plaintiff is now proceeding on the theory of res ipsa loquitur, alleging that her injuries would not have happened except for the negligence of some party. She suggests through affidavits and depositions of experts that the ulnar neuropathy occurred due to the placement and padding of her arms during surgery, but that because she was unconscious she cannot identify either the instrumentality or the individual responsible for the injury.

We have previously been faced with only one case which concerned hospital liability under the res ipsa loquitur doctrine. In *McCall v. St. Joseph's Hospital*, 184 Neb. 1, 3-4, 165 N.W.2d 85, 88 (1969), we explained the doctrine: "[T]he accident and the resulting injuries are such that in the ordinary course of things the accident does not happen if those who have the exclusive management or control of the instrumentality or agency, proximately causing such accident, or injuries, use proper care."

We cited a Washington case for its definition of three situations in which negligence may be inferred without affirmative proof:

"(1) When the act causing the injury is so palpably negligent that it may be inferred as a matter of law, i.e., leaving foreign objects, sponges, scissors, etc., in the body, or amputation of a wrong member; (2) when the general experience and observation of mankind teaches that the result would not be expected without negligence; and (3) when proof by experts in an esoteric field creates an inference that negligence caused the injuries."

*McCall, supra* at 5, 165 N.W.2d at 88, quoting *Horner v. Northern Pac. etc. Hosp.*, 62 Wash. 2d 351, 382 P.2d 518

(1963). We are not concerned with a foreign object here, but with an event which would not be expected to occur without negligence.

The "general experience" or "common knowledge" test has been accepted by other courts as well. In *Voss v. Bridwell*, 188 Kan. 643, 662, 364 P.2d 955, 970-71 (1961), the Supreme Court of Kansas held:

> Where common knowledge and experience teach that a resulting injury would not have occurred to a patient if due care had been exercised, an *inference* of negligence may be drawn, thus giving rise to an application of the doctrine of *res ipsa loquitur*, without medical evidence which is ordinarily required to show not only what occurred but how and why it occurred.

(Emphasis in original.)

More recently, the Wisconsin Court of Appeals held that res ipsa loquitur may be invoked " 'in medical malpractice actions only where a layman is able to say as a matter of common knowledge that the consequence [sic] of the professional treatment are not those which ordinarily result if due care is exercised . . . .' " *Froh v. Milwaukee Medical Clinic, S. C.*, 85 Wis. 2d 308, 314, 270 N.W.2d 83, 85 (1978). See, also, *Dalley v. Utah Valley Regional Med. Ctr.*, 791 P.2d 193 (Utah 1990) (res ipsa loquitur applies where it is within a layperson's knowledge that some negligence occurred; expert testimony is not required).

As we noted in *McCall, supra* at 5, 165 N.W.2d at 89, "The essence of res ipsa loquitur is that the facts speak for themselves and lead to a proper inference of negligence by the fact finder without further proof." Res ipsa loquitur allows the inference of the defendant's negligence because the inference "is probable and more plausible than any other explanation propounded. . . . [T]he plaintiff need not establish the exact manner in which he was injured, or the precise act or event which precipitated his injury." *Morgan v. Willis-Knighton Medical Center*, 456 So. 2d 650, 655 (La. App. 1984). See, also, *Beatty v. Davis*, 224 Neb. 663, 400 N.W.2d 850 (1987); *Nownes v. Hillside Lounge, Inc.*, 179 Neb. 157, 137 N.W.2d 361 (1965).

We find that it is appropriate for the plaintiff here to rely on

the doctrine of res ipsa loquitur as her theory of recovery. It is within the common knowledge and experience of a layperson to determine that an individual does not enter the hospital for extraction of her teeth and come out with an injury to nerves in her arms and hands, without some type of negligence occurring. Because res ipsa loquitur is a procedural doctrine and not a part of the substantive law, it raises an inference of negligence, which is enough to allow the case to go to the jury on that issue with no requirement other than that the facts pled in the petition are supported by proof. There is no corresponding duty for the plaintiff to go beyond that to prove other facts. Summary judgment is not appropriate, and the district court erred in its granting of the defendants' motions.

EXCLUSIVE CONTROL OF INSTRUMENTALITY
Under this doctrine [res ipsa loquitur], when an instrumentality under the exclusive control and management of the alleged wrongdoer produces an occurrence which would not, in the ordinary course of things, come to pass in the absence of the negligence of the one having such management and control, the occurrence itself, in the absence of explanation by the alleged wrongdoer, affords evidence that the occurrence arose as the result of the alleged wrongdoer's negligence.

*Widga v. Sandell*, 236 Neb. 798, 803, 464 N.W.2d 155, 158 (1991). See, also, *Ybarra v. Spangard*, 25 Cal. 2d 486, 154 P.2d 687 (1944).

We have already established that the injury sustained by Swierczek is of a kind which does not ordinarily occur in the absence of someone's negligence. We next consider whether it was caused by an agency or instrumentality within the exclusive control of the defendants.

The situation in the *Ybarra* case is similar to Swierczek's situation. The plaintiff entered the hospital for an appendectomy and awoke from the operation with a sharp pain between the neck and the right shoulder. The pain spread to the lower part of his arm and grew worse, eventually developing into paralysis and atrophy of the muscles around the shoulder. He asserted that the injury occurred while he was in the

operating room under anesthetic, and brought suit against the doctors, nurses, and anesthetist.

The *Ybarra* defendants argued that the plaintiff had not shown an injury caused by an instrumentality under the control of the defendants, had not shown which instrumentality caused the injury, and had not shown that any of the defendants had exclusive control over any particular instrumentality.

The court held that the doctrine of res ipsa loquitur applied and that

[e]very defendant in whose custody the plaintiff was placed for any period was bound to exercise ordinary care to see that no unnecessary harm came to him and each would be liable for failure in this regard. . . . The defendant employers would be liable for the neglect of their employees; and the doctor in charge of the operation would be liable for the negligence of those who became his temporary servants for the purpose of assisting in the operation.

*Ybarra, supra* at 491-92, 154 P.2d at 690.

Physicians and nurses who assist in an operation, though employed by the hospital, "normally become the temporary servants or agents of the surgeon in charge while the operation is in progress, and liability may be imposed upon him for their negligent acts under the doctrine of *respondeat superior.*" *Id.*

The court said that when the patient was unconscious during surgery

it is manifestly unreasonable for [the defendants] to insist that he identify any one of them as the person who did the alleged negligent act.

. . . It should be enough that the plaintiff can show an injury resulting from an external force applied while he lay unconscious in the hospital; this is as clear a case of identification of the instrumentality as the plaintiff may ever be able to make.

*Ybarra, supra* at 492-93, 154 P.2d at 690-91.

The California court noted that the test of control is one of the right of control rather than actual control, and held that when an unconscious plaintiff receives an unusual injury as a part of medical treatment, all defendants who had any control

over the body or the instrumentalities which might have caused the injuries may be required to give an explanation of their conduct. *Id.*

Other courts have also applied the "borrowed servant" doctrine to similar malpractice actions. In a case in which carpal tunnel surgery was canceled when problems developed with the anesthesia, an appeals court in Maryland found that "the surgeon acted as a special employer who borrowed nurses and other attendants from their general employer—the hospital—and thus became liable for their negligence." *Franklin v. Gupta*, 81 Md. App. 345, 367, 567 A.2d 524, 535 (1990), *cert. denied* 319 Md. 303, 572 A.2d 182.

However, an Illinois appellate court rejected the "borrowed servant" rule and held that hospital employees who assist a surgeon remain hospital employees "even though the surgeon retains some degree of control over them." *Foster v. Englewood Hospital Ass'n*, 19 Ill. App. 3d 1055, 1061, 313 N.E.2d 255, 260 (1974). If the control is retained, the surgeon may be liable for the hospital employees' negligence. The court noted "a rule making a surgeon liable for every negligent act of every hospital employee under his control is too harsh, a rule exculpating him for every negligent act of persons under his control simply because they are not his employees is too lenient." *Id.* at 1063, 313 N.E.2d at 261.

In the present case, Dr. Lynch argues that he cannot be held liable because he was not in the operating room at the time the plaintiff was moved from the cart to the operating table and that he had no responsibility for her transportation either to or from the surgical suite. In a case where the plaintiff fell off the operating table and was injured, the Colorado Supreme Court held that, because of the complex activity in an operating room, the exact moment at which the surgeon's responsibility begins cannot be determined.

> It is not a matter of law when the sole responsibility of the hospital ends and the surgeon's responsibility begins or supersedes it. *These are questions of fact for the jury under the particular circumstances of each case.* The surgeon cannot arbitrarily fix the time at which his responsibility begins.

(Emphasis supplied.) *Beadles v. Metayka*, 135 Colo. 366, 370, 311 P.2d 711, 713 (1957). Swierczek did not receive the opportunity to present her case to a jury to allow it to determine these questions.

Citing an Oklahoma case, the *Beadles* court noted, " 'The patient is helpless under the influence of an anaesthetic and absolutely at the mercy of surgeons performing the operation, and they are charged with the duty to see that no preventable injury results to their patient. . . .' " *Id.*, quoting *Aderhold v. Bishop*, 94 Okla. 203, 221 P. 752 (1923).

The Utah court in *Dalley v. Utah Valley Regional Med. Ctr.,* 791 P.2d 193, 197 (Utah 1990), stated:

> The very purpose of the doctrine of res ipsa loquitur is to allow a plaintiff who may have been unconscious or incapacitated during an operation the opportunity to establish negligence and causation by circumstantial evidence. A plaintiff who is under anesthesia or otherwise incapacitated can identify neither the instrumentality nor the person(s) in control of the instrumentality. To place this burden of proof upon a plaintiff is to require the impossible.

The court said a better approach would be to allow the plaintiff to "prove causation either by tracing the injury 'to a specific instrumentality or cause for which the defendant was responsible' or by showing 'that the defendant was responsible for all reasonably probable causes to which the accident could be attributed.' " *Id.*

In that case, in which a woman sustained a burn on her leg while undergoing a caesarean section operation, the court said that a plaintiff who receives an injury to a body part not involved in the operation is entitled to call upon res ipsa loquitur. The burden is then placed

> upon those persons who were awake, aware, and conscious at the time of the injury, who were responsible for the plaintiff's safety at a time when he or she was not in a position to assume that responsibility. Res ipsa loquitur infers [sic] causation, and therefore a material issue of fact exists that must be presented to the trier of fact. If plaintiff prefers to rest upon the inference of cause established by

res ipsa loquitur, then that is a tactical decision that should not be short-circuited by summary judgment.

*Dalley, supra* at 200.

As we noted in *McCall v. St. Joseph's Hospital*, 184 Neb. 1, 6, 165 N.W.2d 85, 89 (1969), courts have generally held that the exclusive control requirement "is satisfied if it is shown that the injury resulted from an external force applied while the plaintiff was in the control or custody of the defendants, even though by subsequent explanation some of the defendants are exonerated from the charge of negligence." Exclusive control is shown where "there was no possibility that a third party, not a defendant, could have caused the injury." (Emphasis omitted.) *Id*. Swierczek should be allowed to rely on the inference of negligence raised by res ipsa loquitur or to present further evidence as to the instrumentality which caused her injury. She was short-circuited here.

## NONDELEGABLE DUTIES

The hospital and surgeon cannot escape liability by attempting to delegate the responsibility for activity in the operating room to the anesthesiologist or other staff present there. The duty of care owed by a physician is nondelegable, which

> means that an employer of an independent contractor . . . by assigning work consequent to a duty, is not relieved from liability arising from the delegated duties negligently performed. [Citation omitted.] As a result of a nondelegable duty, the responsibility or ultimate liability for proper performance of a duty cannot be delegated, although actual performance of the task required by a nondelegable duty may be done by another.

*Foltz v. Northwestern Bell Tel. Co.*, 221 Neb. 201, 213, 376 N.W.2d 301, 309 (1985). In plain language, the law ordinarily does not permit a tort-feasor to escape liability by the act of attempting to transfer responsibility for a nondelegable duty to an independent contractor.

Dr. Gatz, the anesthesiologist, is the only remaining defendant, following the granting of the motions for summary judgment. There are questions of material fact as to what

caused Swierczek's injuries and as to who might be responsible for them. If the actions of the district court are allowed to stand and Dr. Gatz is able to prove that he was not responsible for Swierczek's injuries, she will be without recourse against the other defendants.

As the surgeon, Dr. Lynch is responsible for the total care of his patient, and although he asserted that he had nothing to do with transporting Swierczek, it is not clear from the record that the injuries occurred during transportation. Her arms could have been bumped or rearranged during the course of surgery. Dr. Lynch cannot be excused from the action at this point.

The hospital, which is responsible for the actions of its nurses and nurse anesthetist, also cannot be excused from the action. A copy of Bergan Mercy's operating room procedures is in the record, and it indicates that the circulating nurse assists anesthesia personnel with transferring the patient to the operating room and with positioning the patient on the operating table. The scrub nurse assists with draping the patient, and the circulating nurse assists in securing the large drape. The anesthetist and circulating nurse transfer the patient to the recovery room. The circulating nurse, with guidance from the anesthetist, is responsible for assuring that the patient is in good body alignment and is protected from pressure during surgery. It can be inferred from these policies that the hospital and its nurse anesthetist exercised control over the instrumentality which caused Swierczek's injuries. Neither of these parties can be excused at this point.

Swierczek, by pleading the doctrine of res ipsa loquitur, has raised an inference of negligence, which must be answered by all named defendants. The injury to the nerves in her arms is not an injury which would normally occur during the extraction of teeth, absent some negligence by some party. She is entitled to present her case to a jury to determine whose responsibility it was to assure her safety. The district court erred in granting summary judgment to Dr. Lynch, Caldwell, and the hospital. We reverse, and remand the cause for further proceedings.

REVERSED AND REMANDED FOR
FURTHER PROCEEDINGS.